Good morning. May it please the court. My name is Sam Henderson. I'm here for the appellant Mr. Daliang. I think it's Guo, but Guo works. I plan to reserve three minutes for rebuttal and I'll watch my clock. And I'm planning to focus my argument on the district court's erroneous application of a four-level leader-organizer enhancement at guideline section 3b 1.1a, so the last issue in briefs. That said, I'm happy to answer any other questions the court might have about any other issue. In terms of the the four-level enhancement, the district court's erroneous application of this four-level enhancement dramatically increased Mr. Guo's guidelines range, raising the low end of his range by 60 months. And in order to explain why the district court's application of the enhancement here was both unprecedented and contrary to this court's precedent, I need to start by addressing some case law that I didn't really properly address in the reply brief. And so as you'll remember in the opening brief, I argued that this court's case law requires that for the four-level leader-organizer enhancement to apply, the government had to prove Mr. Guo had actual organizational authority or control over the others involved in the offense. And I then argued that the district court failed to recognize that requirement of authority or control and that even if it had, there was no evidence that Mr. Guo had any power to actually tell anyone what to do or compel them to follow his orders. So no control. In its opposition, the government attempts to counter this argument not by showing that Mr. Guo actually had the ability to compel others to do what he was saying, but by saying that this court's case law doesn't require that kind of control and claiming instead that the case law permits a leader-organizer enhancement where the defendant merely organizes others by having the ability and influence necessary to coordinate the activities of others to achieve the desired result. In the reply brief, I explained that Mr. Guo didn't have that kind of ability and influence. But more importantly, and this is the part that I didn't properly address in the reply, this court's precedent forecloses the government's argument for applying this lower organization with influence but without control standard to the four-level enhancement. To start with, all the cases in which that theory of, you know, organizing with influence but not control are applied are two-level enhancement cases under Section 3B 1.1c. So I'm looking at Doe, I'm looking at Varela, Whitney, Holden, these cases that are cited in the briefs. The only case cited by the government that seems to, that's a four-level enhancement case that seems to approvingly mention this organizing with influence but without control theory is Camper. But Camper only mentions the theory while it's discussing the rules around the enhancement and it clearly doesn't apply in that case where the defendant had control over his co-defendant who he, quote, used as a runner. But it's not just that the court hasn't applied the organization without retaining control theory to the four-level enhancement. It's actually held that that theory doesn't apply to the four-level enhancement at all. And this is, this is what I want to point you to. It's United States via Villa, which is a case that I cited in my brief but I didn't expound on. There are two of Villa cases. This is the 1996 one at 95 F 3rd 887. And in that case, this court specifically noted that cases about a two-level enhancement have been implying, been implying the enhancement where the defendant organized the offense but hadn't retained supervisory control over others. And then, and then said that was just inappropriate for the four-level enhancement. This is the Money Court. It however appropriate it may be to find a person who's exercised no authority over others to warrant a two-level departure for being an organizer or leader or manager or supervisor, it is not appropriate in the context of the four-level adjustments where precisely what distinguishes a leader or organizer from a manager or supervisor is control and authority over others. So here, where what is at issue is this four-level enhancement at 3b 1.1a, the government can't rest on this organization with influence but without control theory because this court has already said that theory is only applicable to the two-level enhancement, not to the four-level enhancement. Can I ask you a question about the scheme and how it worked and Mr. Gould's role in it? Of course. To follow up just with your downlines? Didn't he have more than just influence? No, not at all, your honor. I think maybe the thing to understand here is that there's no corporate structure here, at least as regards the promoters. Maybe there was in the CKB executive suite in Hong Kong or whatever. But with the promoters, there's no, there's no, nothing like you might see in a corporation or even in a mafia or cartel situation where you have a boss ordering around underbosses and the underbosses order around middle management, middle management orders around lower management, etc. down the line. There's nothing like that. There's no, there's no hierarchy. The structure here is, is entirely a financial structure. The way that the, the CKB executives, Howard Stern and Ray Losantos, the way they get the promoters to do what they want is through this, this set of financial incentives that they put together for how much each person gets paid for the sale of a unit. And so there's no, there's no, no one's reporting to anyone. Nobody is supervising anyone. Nobody is managing anyone. There's no, there's no lines of hierarchical control whatsoever. I think you can see that in... Let me ask you this. How did the promoters know what to do with any money that they received? I mean, I would assume that comes in, in the, the instructions from CKB on selling the units. You buy a unit from CKB, you become eligible to be an online marketing angel, and then, you know, they're, and truthfully I don't, I don't have those instructions in front of me, but there's got to be some sequence of, okay, you make a sale, you do this, you do that. There are, you know, there's, there's discussions among the promoters about, okay, well you should, you know, you can use the money in someone's unit for them, and then you can keep the cash. But that's not, that's not an order from on high. That's not, that's not an order from the company. It's not something CKB needs to happen. That's something the promoters are doing among themselves to, to, to grab cash. It's, it's like a, you know, the, it's, it's advice on how to commit the offense better. It's not, for lack of a better word, it's not an order. Nobody can compel anyone to do it. Let me ask you this. In your view, what did the evidence at trial show was the defendant's relationship with his promoters, his downlines? Sorry, with his, I mean, it, it, it's a little unclear. I mean, he had, so with Wendy Lee, he had a closer relationship, like a more personal relationship. He'd talk to her. She would come to him. She'd ask him advice. He'd give her that advice. But there's, again, there's no order. She testifies specifically. I run my own business. I'm an independent contractor. I can sell the way I want to sell. So, so, you know, it's, it's, I think it's sort of the equivalent of me going to an older lawyer in my office and saying, hey, I have an oral argument coming up tomorrow. What do you think of this point? And they, they'll, they give me advice on it, but I mean, probably I should take it. It's probably good advice, but nothing forces me to take it. There's no. So, you know, the government in their briefs, in a trial, I guess, pointed out that Mr. Gould was, Gow was on the videos. Yeah, and so. The brochure videos. So what is that? Is that just showing his influence or, or what? I mean, how would you characterize that? I mean, he apparently had a, had some sort of role. So he's, he is hired by CKB to make those videos. So just to, just to be clear, these are not his own initiatives. He's not pushing these things out himself. CKB hires him to, to make these videos. So, I mean, if you're talking about, and again, I, Your Honor, you've mentioned influence a couple of times, and I want to point out that, as I said earlier, under Avila, 1996, influence isn't a theory that, that matters for the four lawyers. But I understand that, but I mean, you would say that, so what your argument is, is that it, at most, you could say that was, he was sort of an influencer or a facilitator, but he wasn't exhibiting control or authority. Yeah. And, and, and just start, finish the thought on the videos. He's hired by, by CKB to produce the videos. So they're not an indication of his control. This is Howard Stern, sorry, Howard, Howard Stern, further organizing the events, saying, okay, we want, we want some training. This guy's good. I'm going to hire him to make, it doesn't put Mr. Blow in, in, in control of anything. He's, he's being, you know, positioned as being coordinated. So counsel, it seems like, and I see your point from the, from our Avila case, but it seems like you're, you know, the, the, the actual sentencing guidelines use the word organizer or leader, right? Organizer or leader. And it seems like you're really focused on sort of a mafiasque or military type leadership type. But I mean, there's other styles of leadership. I would assume that those styles of leadership would not work very well in a multi-level marketing type organization and multi-level marketing organization relies on charisma and the ability of people to influence and get people to do what they want without ordering them to do it by the very nature of the organization. Like I don't, and so here, you know, if you look at the, if you the nature of, in addition to degree of control or authority, I guess one of the issues is like whether you can control people with whether, whether the only way to control people is to like have the right to order them to do something. Obviously it doesn't seem like he had that, but it also does seem like he, he had the ability to get people to do what he wanted them to do. And so that seems to be a degree of trouble. The other things are nature of participation, that commission of the offense. I mean, he's the top dog other than the folks back at the recruitment of accomplices. I mean, that speaks for itself here. Claimed right to a larger share of the fruits of the crime. I think that speaks for itself here. Degree of participation in planning or organizing the offense. Your, your point is, well, they, it all happened back at, with Howard Shurn. But he's, you know, he was making videos, maybe a third direction, but he was making videos and figuring out how to make this work better. So I, you're really focused on like, sort of, like I said, like a military style hierarchical control. But what, what about the idea that he could, he could and did exercise a high degree of control by using what you would call soft leadership skills? I don't think the there's a lot in your question, your honor. So I'm going to try to address the different pieces. I don't think that the authority, this is not. The guideline actually doesn't, it uses control authority as one of the factors, but the actual wording is organizer or leader. I understand your honor, but I'm looking at the, the case law talks about control and authority and, and the way I look at it from the committee note, you've read through them. There's the exercise of decision-making authority and the degree of control and authority exercised over others. The way I understand this court's then it's saying that for the four level enhancement, those two, the first and the last factor are the key factors. And that, that without those, you don't, those feelings seem to be in the context of the type of criminal organization. If you look basically drug dealing, right. Where is sort of the paradigmatic, you know, you shoot the dude below you if he doesn't do what you want. Right. But that's not how, I'm not sure there's any multi-level marketing organization that then, so I don't know that this applies to multi-market or marketing organizations. And that's kind of your argument, I think, right? Is that it's never, as far as I can tell in all my research, it's never been applied to a promoter in a multi-marketing organization. I haven't seen it in this or any other circuit. And I assume it's the same for the government. And I see what you, but the challenge is, is that the words are the actual words are organizer or leader. It seems like you can have, you can be an organizer or leader in a multi-level marketing organization. And then when you actually look at the notes, you're really putting a lot of focus. And I agree that the Abila case puts a lot of focus on control and authority. But there's a whole bunch, but that's like, that literally is the last thing in the string of listing of things. And a whole lot of the other ones seem, a whole lot of the other factors, nature of participation, the commission defense, recruitment of accomplices, etc. seems to be on pretty all fours at this case. Let me push back on that a little. I mean, he's not, the point of this would be to distinguish him from his co-defendants to some extent, right? Not every, I mean, I know you can have more than one leader, but not everybody can be a leader, right? And he's, his, so his participation, he's, he's training people. Wendy Lee trains people. Wendy Lee trained Heywood Chang. Kiki Lin trains people. Kiki Lin made her own videos and put them out on her own initiative, not being hired by CKB. Recruitment of accomplices, everybody involved in this is recruiting accomplices. Anyone who ever sold a unit of CKB is recruiting accomplices. So the fact that you sold units and recruited accomplices doesn't, can't be the thing that makes you a leader. Claim right to a larger share of the fruit of the crime. He's not claiming anything. It's being given to him by the company. The company sets out the rules. This isn't a situation where he's elbowing other people aside and saying, hey, give me the lion's share. I'm the big dog here. This is, these are the rules laid out by the most successful employee under those rules, so he does well. But that, you know, the, the larger share of the fruits of the crime, that should apply to all the participants too, not just the promoters. And, and the evidence seems pretty clear that Howard Shurn and Ray Losantos made a lot more money out of this than he did. Because at least 15% of the total 260 million was going up the line with CKB. I, I, I hear your argument. Not everybody can be a leader organizer. It does seem like you could have, in an organization like this, you could have a dozen or so. And so I, it seems like most of your argument is, well, if he was a leader organizer, so were some of these other names we see in the briefing, the people that fled out. I don't know that that necessarily means that he couldn't be a leader and organizer. That could be true, that they too were. But then the big, the big dogs in this organization. But the court didn't apply it to them, is some of the logic here. That it's, you know, if you're looking at the court's reasoning, how the court did this, these didn't apply it to them. And so it seems odd and illogical to apply it to him. Those are, these are the folks that fled. Is that right? Yes. Do you know, was there some sort of agreement about whether this should apply or not to those folks that it, when it was presented to the court, you know? Um, I, I, you know, I don't know. Um, but I, I can ask the government, the government, uh, what or not they, you know, they, they bargained for it. I mean, the logic in some ways should be the same as the, the plea agreement should reward someone through 5k, not by knocking out, um, uh, uh, enhancements that, that, that do apply. Right. That doesn't, that doesn't always happen. You know, they bargain away. Everything is bargainable once you agree to plead and cooperate, which is what I understand. You know, the people did, but can I ask you, because your time's running, what enhance, should it have been a three-level enhancement? I, I, I don't actually think the three-level enhancement applies either because of the supervision. You know, that's talks about supervision management, as I was previously explaining. There's really no supervision management structure here among the promoters. I think the enhancement that really applies is the loss of enhancement. He got an 18 point enhancement for his rewards from this system, which take into account the fact that he's getting little dribs and drabs of money from every sale that's happening. So that's, you know, that, that, the fact that he is, um, as Judge Rundegg put it, a, a, you know, a top dog, a top promoter, he's, he's doing well as a promoter. That's already taken into account in the, in the lawsuit. Let me ask you another question. Did the district court actually departed downward from the guideline range, even with a four-level enhancement? Yes, Your Honor. To 144 months. And, and what would, what would the, uh, if it were, if I, I, my, by my, I calculated if it were three-level enhancement, it would be 151 to 188, which would still be more than what the district court departed downward to. What would the guidelines have been if you're correct that it's only two? I know you have to, you have to technically, the judge has to correctly calculate the guidelines. So, I just, I just want to know. I understand, Your Honor. If I'm correct, then it's, uh, that I'm not arguing for two. I'm arguing for zero. Two clearly doesn't apply because two is for small organizations. Um, if, if, if I'm correct, that this just doesn't. So there's no, according to you, there's no role. There's no role enhancement for him, no. That's my argument. And, and the low end then would be 108 months. And, and then, you know, the court does have, I think the assumption would be the court does have to correctly calculate that that number becomes the lodestar. And so, you know, even if the three-level applied and he was at 151 months guideline wise, there's at least, I think, a strong probability that the district court varies down from there too, because the, because the, um, you know, the, the variance is taking into account mitigation factors that are not part of the guidelines. And I'm, I'm, I, I, I'm inclined to agree that whatever the judge did, he's got to correctly calculate the guidelines because he's got to take the guidelines into account, uh, in, in whether he downwardly departs and he's going to have to take them into account. They have to be correctly calculated. But I'm just trying to understand, you know, the, the full extent and consequences of your argument. Yeah. So my argument is that the proper guideline range would have been 108 to 135. Okay. Why don't we hear from the, from the government? Good morning. Richard Robinson, assistant United States attorney on behalf of plaintiff and appellee of the United States. Mr. Quill's counsel has focused exclusively on the 3B1.1 enhancement, and I will address that. But before I do, I'd like to make some general points about some of the other claims on appeal. With respect to sufficiency of the evidence for the conspiracy count, um, I submit that while there may be some dispute over exactly when Quill may have joined a conspiracy, the government maintains that by the first overt act, which was in October of 2011, Quill was a member of the conspiracy. Um, there was no question that he joined the conspiracy at some point, um, because the first superseding indictment in this case included as a manner and means of conspiracy, uh, concealing, uh, evidence from the SEC and the SEC's action. And, uh, overt act, um, in fact, an overt act in the first superseding indictment, the last overt act, um, in furtherance of the conspiracy, overt act 12 is that on or about October 15th, 2013, defendant Quill, Chang, Chen, and Lin agreed not to provide certain information and documents and data about CKB to the SEC in its lawsuit against defendant Quill and others. There is no dispute that that's what happened and that the evidence established in the trial, there was testimony from Chang and Lee, both about having that meeting with, including Quill in which the parties agreed to that. So the government submits that the evidence supporting the conspiracy count one, uh, is, is really beyond dispute with respect to Mr. Quill's participation in the conspiracy. Whether you mark that from October of 2011 as the government claims and supported in its brief with the evidence shown at trial, or you look at the later date when Quill explicitly agreed with others to continue the conspiracy by, uh, hiding evidence and not turn it over. Why was it necessary for the gut, for the court to, for the district court to revise the Pinkerton instruction? Excuse me, your honor. So the Pinkerton instruction that the court gave. Yes. It's not the standard ninth circuit instruction. For some reason, the court felt it necessary to revise it. I'm just curious why. Your honor, I don't know, there's an answer to that in the record that I can cite. Um, I, I would point out that... Did you encourage the court to do that? No, your honor. I did not try the case, but I didn't see anything in the record where the prosecution made that suggestion. And in fact, and I think this is quite important, when the prosecutors argued the case to the jury, in fact, they, the prosecutor argued, um, the specific provision, which defendant Guo claims was omitted from the instruction, namely that Guo had to be a member of the conspiracy at the same time as the wire fraud count offense was committed by his co-conspirator. In closing argument, the government counsel made that clear. And the argument is that would be one of the necessary things for the jury to find. So that is one of the reasons why we argue that it would be harmless here and not prejudicial because the jury would not have been confused by the instruction. And in addition to the fact that other instructions, we believe when read in Guo says he feared it happened, namely that he was tagged with Pinkerton liability for wire fraud offenses that predated his joining the conspiracy. That just is not a reasonable interpretation of the instruction that the jury would have understood at the time in context. It just seems strange that the court would have revised the model of instruction along these lines. I didn't quite understand why she felt it was necessary. I'd like to move on and then, excuse me, raise a point which was raised in the government's brief, but I do not believe was raised or addressed in the appellant's briefs, either the open brief or the reply brief. But I think it is very important because it, again, goes to the sufficiency of the evidence for the wire fraud counts. Noting, of course, that Mr. Guo does not challenge the sufficiency of the evidence of all the wire fraud counts, he only challenges the sufficiency of the evidence with respect to certain of the wire fraud counts. And that is that Guo on appeal proceeds on what I submit as a false premise. The false premise is that the only way the government could prove he was liable under the wire fraud counts that he's challenging is on a Pinkerton liability theory, but that is not the case. At trial, the government argued and the jury was instructed that Guo could be convicted on an aiding and abetting liability theory, and there was no challenge on appeal as to that aiding and abetting instruction. And the government argued that there was ample evidence to establish that Guo aided and abetted those involved, namely his downline, in soliciting the investors who provided the wires, which are the subject of those counts. Or in the case of Wendy Li, his downline, who sent money to CKB, she was his downline, and what the government had to prove was that Guo procured or induced those individuals to commit wire fraud. And here there was ample evidence of that. He trained them. He trained them basically in how to lie and misrepresent what CKB was offering to investors. He personally profited from his downlines, development of, and recruiting of new investors. And so we would submit that all the challenge counts, all the challenge wire fraud counts could be, and were, amply supported by sufficient evidence at trial that Guo aided and abetted his downline in committing those offenses. So that's your response to his particular argument is to count three. Well, with respect to count three, he challenges that on somewhat different grounds. He challenges count three on the basis that there was insufficient evidence that his downline, Kiki Li, sent the money that was wired to CKB in Hong Kong, that that had sufficient connection to be in furtherance of the wire fraud scheme. And as I believe the government argued in its papers, there was sufficient evidence to show under a plain air standard in particular, that that wiring was in furtherance. And the reason I want to note the plain air standard is because in the district court, there was a rule 29 motion that was made by defendant Guo, but it was made on particular grounds. And none of those grounds were that there was a insufficiency of evidence as to count three and the wiring, because it wasn't in furtherance. He made a rule 29 motion on other grounds. And because he did not make the argument for the rule 29 on the grounds that he now uses on appeal, the government submits that the plain air standard applies. Right. I thought your, well, whether it's plain air or de novo, I thought your argument was that the jury could draw a reasonable inference from the evidence. Absolutely. Taking into consideration the evidence at trial that Kiki Lin was one of Guo's top downlines, that she started working with Guo in July or August of 2011, according to Guo's statement to the SEC, but he was deposed, that she sent funds from an account controlled in the name of USA Group to an account that CKB used to receive investor funds, and that her pyramid raised $137 million and she was only one level below Guo in ranking. I think we submit that there was ample evidence for the jury to reasonably infer that the money that she was sending was in connection with furthering the wire fraud scheme to solicit investors fraudulently. Can I ask you one quick question? The amount was $47,000, I believe, in account three. Did that, does that amount in any way affect the enhancement for the amount involved in the scheme to defraud? In relation to the total loss in this case? Yes, I'm sorry. No, the loss in this case was massive. It was $140 million was attributed to Guo's downlines. So even if he had been acquitted, what would have been the consequence on that account other than he would have been acquitted? As far as the sentencing guidelines are concerned, no consequence. In fact, unless the Supreme Court decides otherwise at some point, and it may, or I think Congress is considering it, that the judge could have taken it into account even if he were acquitted. That's true. That's correct. Then briefly with respect to the exclusion of the hearsay statement by a non-testifying co-defendant. Counselor, you're kind of running out of time. Do you mind jumping to the... Yes, I will. Yes, I will. ...forepoint enhancement. So the enhancement under 3B1.1, I think the court has noted some points that I would like to emphasize too, namely that the particular nature of an investment fraud scheme involving a pyramid, which is what we have here, is quite different than a drug conspiracy or a violent crime conspiracy. Here, Woe's Pyramid was responsible for raising over half of the $260 million that was raised by CKB. And he was the top producer. He had a right to a larger share of the fruits and indeed 3% of the overall worldwide sales. And then he got a bonus of $250,000. He was the only one. That is correct. He was the only person who got that. He was the top person. He went around the globe, not only appearing in videos, but making appearances. I think we're all aware of the facts. So the question, I guess, the precise question that I'm wondering about is, his attorney is relying on the fact that says, hey, we've got this Avila case from 1996, and that says you have to have control or organizational authority. And basically, as I understand, his argument is, yeah, you can have leadership in a pyramid scheme, but you don't really have, even if you're the top dog, you don't, you don't have the type of control or organizational authority. So how does he have, you know, he talked about the Avila case, this control organizational authority, how that affects. Well, I understand that the Avila case does speak in those terms. And to the extent that the court needed to look to some participant, some co-conspirator in the scheme who, well, had organizational authority or control over, I think there was sufficient evidence that he had in effect, de facto control over Wendy Lee. Wendy Lee is a person who he trained, who he spoke to on a regular basis. When investors complained about the fact that they weren't able to convert their profit reward points, PRPTs to cash, he instructed her basically how to lie to them and how to mislead them. And his relationship with her was such that he came out to Los Angeles where she was based multiple times to present to her group. He had tremendous influence over her ability to succeed with her own group in soliciting others. So to the extent that Avila requires that there be some control over at least one of the accomplices or the co-conspirators, I would submit that there was de facto control, at least over Wendy Lee. Was Wendy Lee also an organizer? Yes, she was. Was she under the guideline? There certainly could be an argument that a person in her position, which was. Why doesn't your argument apply to her and everybody else that is in that position? Well, I think it is a matter of degree in terms of how much they were involved in organizing and how big their pyramid was. And. Hers was pretty big, wasn't it? Well, she was below, but yes, she had a substantial pyramid. She made, I believe, a couple million dollars or so that she derived from the scheme. But they were not, as I understand it, none of them had this four point enhancement in their pleas. What was the what was the thinking there? Was that something you think was just put away or you or you didn't think they were actually leaders organized? To be frank, I was not involved in that part of the case, so I would only be speculating about what was worked out between the prosecutors and the cooperating witnesses. That's not in the record. It would not be unusual for a prosecutor to work out a cooperation plea agreement that took certain factors into account and weighted others more highly than some others. But I would only be speculating on the record as to how that worked out. To be candid. I think I would submit that the court is confronted as, as Guo's counsel has noted, with a somewhat, if not novel, not common situation here. I've also looked at the three B1.1 leader organizer cases, hoping to find one that dealt specifically with a pyramid scheme that was applied to a high level organizer or a leader in a, in any kind of comparable role. And I was not able to find one, but I don't think that that should deter the court from finding that the district court abused its discretion or did not, I don't think, abuse its discretion in concluding, in applying the factors that Guo deserved to receive that leader organizer enhancement. The court cited the pre-sentence report, which listed the factors under three B1.1. The court went through those factors on the record. While the court didn't use the specific words control or organizational authority, the court did take into account, among other things, the relationship that Guo had with Wendy Lee that I mentioned. So I believe that there was a sufficient basis for the court to apply that enhancement to Mr. Guo in this case. My recollection is that the pre-sentence report suggested that he not only influenced many of his co-defendants, but he provided direction and consultation. Yes. The process of taking investor money and then converting it into money that the promoters such as Guo could keep without sending any of it to CKB, that whole process with the e-wallet, which was described at trial, was something he trained people in doing. And he also trained them in how to structure their legs of their pyramid to maximize the commissions, which in turn incentivized them to recruit more, which made, frankly, the pyramid scheme more pernicious and virulent. That's how we arrived, I submit, at $260 million of investor money taken in, in a relatively short amount of time because of the aggressive organizational and promotion by Guo as a leader. He was basically the leader of the promotional arm of CKB. Okay, I'll give the Mr. Barr's counsel a minute for rebuttal. I'll try to be very quick. The saying that, I'm just going to try to describe this again, in terms of the de facto control over Wendy Lee, that argument just can't stand in light of the record. Wendy Lee says, you know, no one had control over her. She was independent. She could do, you know, she could sell as she wanted. And I point the court to ER 84748 for that quote. I, you know, she goes to him for advice. But if he says something and she doesn't want to do it that way, she just doesn't have to do it. And that's that's not de facto control. Well, what's the consequence? She quits? You know, you could tell your employer, I don't want to follow your instructions. He could say you're fired or she could say, I quit. No, there's no. I mean, does he have to put a gun to her head? No, Your Honor, there's no quitting. She doesn't. He cannot fire her. He cannot he cannot exclude her from selling. He has. That's part of my point in the being no management structure. He has no ability to stop anyone else from selling. They get the right to sell as soon as they buy the unit. So there's there's just, you know, he cannot she doesn't need to be fired. She doesn't need to quit. She can just go on selling however she wants to. And that that's my point about no control. He can't stop her. But I hear I hear what you're saying that it just it it seems like your theory of control, which would be true in a lot of organizations, I'm not sure if you know, is that you can't control somebody unless you can can give them an adverse consequence somehow. And I agree with you. That doesn't seem like he can give them an adverse consequence. But it's not all sticks. Sometimes it's carrots. Right. I don't think he doesn't have carrots either. He can't give them bonuses. He can't the carriages. He can help her make a lot more money. He by by telling her about by helping or by telling her how to organize things. He's telling her. I mean, that's how that's how all multilevel marketing work. Telling everybody how to I mean, he's giving advice to everybody about how to do it. And again, she just doesn't have to follow. I mean, that's I I hear your argument. I just it's tough. It's tough. How it works in this organization. And just very last point, as I say, I'm way over. The counsel said that on the record, the court went through all the factors. That's not actually accurate. The court did not go through the exercise of decision making authority factor. And he did not go through the degree of control and authority exercised over others. Those things were not mentioned in the PSR. They were not mentioned in the sentencing hearing. They were just excluded. And as I've said, those are the two factors that this court has identified as as important to the four level enhancement. So at a minimum, I'd ask to send it back to to have the court look at those and and address that. And I'm way over. I really appreciate. Thank you. Thank you, counsel. We appreciate your arguments this morning. And with that, the matter is submitted.
judges: Paez, Korman, Vandyke